IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



| | |
|---|---|
| UNITED STATES OF AMERICA; and THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, WISCONSIN, THE COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, and THE DISTRICT OF COLUMBIA,<br><br>ex rel. HELEN GE, M.D.<br><br>PLAINTIFFS AND RELATOR,<br><br>v.<br><br>TAKEDA PHARMACEUTICAL COMPANY LIMITED; and TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.<br><br>DEFENDANTS | CIVIL ACTION NO.<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) JURY TRIAL DEMANDED<br><br><br>FALSE CLAIMS ACT COMPLAINT |

## I.   OVERVIEW OF FACTUAL ALLEGATIONS

1.       Helen Ge, M.D., ("Relator"), through her attorneys Baum, Hedlund, Aristei &
Goldman, P.C., and Roddy Klein & Ryan brings this action on behalf of the United States of
America ("United States") for treble damages and civil penalties arising from Defendants Takeda
Pharmaceutical Company Limited and Takeda Pharmaceuticals North America, Inc. (collectively
referred to as "Takeda" or "Defendants") conduct in violation of the Federal Civil False Claims
Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The violations arise out of false claims for payment

made to Medicare, Medicaid, Tricare and other federally funded government healthcare programs (hereinafter, collectively the "Government Healthcare Programs").

2.     This action is also brought under the respective *qui tam* provisions of False Claims Acts (or similarly named) on behalf of the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, the District of Columbia, Virginia, and Wisconsin. These states, together with the United States, are hereafter collectively referred to as "the Government."

3.     This is an action to recover damages and civil penalties on behalf of the Government arising from false and fraudulent records, statements, and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 et. seq., as amended ("the FCA" or "the Act").

4.     As set forth below, Defendants' acts also constitute violations of the California False Claims Act, Cal. Govt Code §12650 *et seq.*; the Delaware False Claims and False Reporting Act, 6 Del. C. §1201 *et seq.*; the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §17511-8; the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. §5-11-5.5-1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §437.1 *et seq.*; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §5 *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §400.601 *et seq.*; the Minnesota False Claims Act, Minn.Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont.

2

Code Ann. §17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§357.010 *et seq.*; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §167.61 *et seq*; the New Jersey False Claims Act, N.J. Stat. §2A:32C-l *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-2F-l *et seq.*; the New York False Claims Act, N.Y. State Fin. §187 *et seq.*; the North Carolina False Claims Act, N.C.G.S., §1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§8.01-216.1 *et seq.*; the Wisconsin False Claims Act for Medical Assistance, Wis. Stat. §20.931 *et seq.*; and the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. §§1-1188.13 *et seq.*

5.    As alleged herein, Takeda has caused thousands of false claims to be made on federal and state health care programs related to Uloric, Kapidex/Dexilant and Prevacid use.

6.    Takeda is the manufacturer of the drugs Uloric (used to treat Gout), Kapidex/Dexilant and Prevacid (both are proton-pump inhibitors used to treat gastroesophogeal reflux disease–GERD). Uloric was approved for US sales in February 2009. Kapidex/Dexilant was approved in January 2009. Due to some prescribing confusion with other drugs whose name began "Ka...", Kapidex was renamed to Dexilant. Prevacid is essentially the same molecular composition as Kapidex/Dexilant; it was approved for US sales in 1995 and it went off patent for generic sales in November 2009.

7.    Takeda has avoided properly reporting serious adverse events caused by these drugs' interaction with other drugs, e.g. Imuran, Methadone or Digoxin, commonly given to the same patient population. The general mechanism for these serious adverse events is that patients

are prescribed and consume a safe plasma level for a drug, but adding Uloric, Kapidex/Dexilant or Prevacid interferes with the metabolism of the initial drug, the initial drug does not break down at its expected rate, thereby increasing its plasma concentration to toxic levels while taking what had been established as a safe dose of the initial drug. So, if a drug like Imuran is taken at normal dose levels, it limits hyperactive auto-immune responses that lead to intolerable rheumatoid arthritis or bullous pemphigoid (painful skin blisters). However, if the proper dose of Imuran is not normally metabolized due to administering a drug like Uloric, the plasma concentration for the Imuran gets so high that it suppresses all immune response and causes bone marrow suppression, one of the most serious, direct adverse drug events. And the problem is that people suffering from auto-immune diseases are also likely to suffer gout or GERD, so unless properly warned, physicians can be misled into causing toxic plasma concentrations of one drug while maintaining its established, ostensibly "safe" dose, due to adding Uloric or Kapidex/Dexilant.

8.     Approved for US sales in February 2009, Uloric has been heavily promoted in television direct to consumer advertising. Takeda projects Uloric to be a billion dollar a year drug within the foreseeable future. As part of its plan to achieve this level of sales, Takeda has under-reported serious adverse events related to Uloric use, some of which required expedited 15-day reporting to the FDA, but were not so reported. Likewise, Takeda failed to properly report Kapidex/Dexilant's drug interaction with Digoxin, leading to toxic concentrations of blood-Digoxin levels and in turn failed to properly report a fatal adverse event of this having occurred. In several of these failures to report adverse events, Relator Dr. Helen Ge attempted to correctly report them, but her submissions were changed or she was directed to change them to

4

avoid Takeda's having to transmit the 15 day expedited report or serious adverse event reporting required for their Periodic Adverse Event Reports to the FDA.

A.     Uloric Bone Marrow Failure

9.     For example, on August 20, 2009, a treating physician, Dr. Rodney K. Ison, reported to his Takeda drug representative that one of his patients had developed bone marrow suppression while taking Uloric.    The initial information from the drug representative to Takeda's pharmacovigilance department did not indicate the patient was hospitalized, but the initial summary typed in to Takeda's ARISg adverse event database by Michele Seng on August 24 stated "the reporter's causality assessment is definite for the event for Uloric."    Betsy Fletcher, the Uloric Post Marketing Manager, received the case for "triage" and Relator Dr. Ge was consulted.    Dr. Ge advised Ms. Fletcher and Ms. Seng that "bone marrow suppression" is "serious" and that follow up was necessary to determine the diagnosis, including obtaining blood tests and a bone marrow biopsy.    Since Dr. Ge assessed bone marrow suppression as "serious" and bone marrow suppression was not on the Uloric package insert, it was a "serious unlabelled" event requiring an expedited 15 day adverse event report to the FDA.    The initial MedWatch form (which was not sent to the FDA) for this reported event (TPA2009A02409) generated by Takeda's ARISg database indicated that the reporting doctor was Dr. Ison, the adverse event term was "bone marrow failure," the event was "serious" and that Dr. Ison considered the bone marrow failure to have been "definitely" related to the patient's use of Uloric.

10.     In violation of multiple criminal and administrative regulations, before a MedWatch form was sent to the FDA for this patient's adverse event while taking Uloric, Takeda's Vice President of Pharmacovigilance, Maria Paris, and Betsy Fletcher, the Uloric Post-Marketing Manager, changed this adverse event term from "serious, unlabeled bone marrow

5

failure" to "non-serious," then later to serious drug-drug interaction (which they erroneously believed was labeled), thus avoiding having to transmit an expedited 15 day report to the FDA. Paris and Fletcher also changed the name of the reporting doctor from Dr. Ison to Dr. Haut, a hematologist with whom Dr. Ison had consulted. Lastly, Paris and Fletcher changed both doctors' causality assessments from "definite" to "possible."

11.     After the consultation with Dr. Ge, Ms. Fletcher reported Dr. Ge's "serious" assessment to Dr. Maria Paris, but Dr. Paris directed Ms. Fletcher and Ms. Seng to record the event as "non-serious" as it "does not meet any serious criteria," because there was no indication of hospitalization. Notwithstanding, Dr. Ge followed through with obtaining the lab values and bone marrow biopsy results and an Adverse Event Report form was faxed to the patient's doctor. Dr. Ge also recommended to Ms. Seng that she record in the ARISg database Dr. Paris' ordering the event to be deemed "non serious" and include follow-up communications regarding this adverse event to make sure there was a recorded trail of what happened.

12.     On August 25, 2009, the Dr. Ison's physician's assistant called back and reported that the patient's hematologist-oncologist (Dr. Haut) had determined that "Uloric is what caused the bone marrow suppression," and that the patient had collapsed while shopping on Aug. 11 and was admitted to the hospital on August 12. Thus, contrary to VP Maria Paris' assertions, the patient suffering bone marrow suppression while taking Uloric was in fact hospitalized. The lab results reported serious, grade 3-4, macrocytic anemia (red blood cell/hemoglobin deficiency) and leukopenia (white blood cell deficiency), which combined indicated bone marrow failure. While Dr. Ge was as at a dentist appointment, her Takeda pharmacovigilance colleague, Dr. Chris Chapman, received this information and directed the event to be deemed "serious, unlabeled" and that an expedited 15 day report should be sent to the FDA.

6

13.     Instead, on August 27, 2009, Dr. Paris directed Ms. Seng to "take out the bone marrow suppression as an event" and record the individual lab result findings as co-manifestations of a Drug/Drug Interaction with Imuran, stating they were labeled events. (Neither macrocytic anemia nor Drug/Drug interaction between Uloric and Imuran are actually labeled.) When Ms. Paris was informed that macrocytic anemia is "UNLABELED," she directed Ms. Seng to enter "Event #1 is Drug/Drug Interaction with Imuran–comanifestations of the interaction are macrocytic anemia and leukopenia." Ms. Seng was also instructed to enter "macrocytic anemia and leukopenia of approx 2 to 3 months' duration, perhaps due to imuran/allopurinol interaction." Dr. Paris indicated that "Drug/Drug interaction is LABELED and therefore the case will NOT be EXPEDITED to the FDA."

14.     In the meantime, Dr. Ge had sent a fax to the patient's doctor regarding Dr. Paris' reference to an interaction between imuran and allopurinol (as opposed to an interaction between Uloric and Imuran) since the patient's records indicated that patient had not been on allopurinol, but instead had been taking Uloric.

15.     Dr. Paris had Takeda's coding department fill out a Form 494-Coding Change and Ms. Seng entered into the ARISg database, "Drug/Drug interaction with assoc co-mans are labeled."

16.     At about the same time, Ms. Seng talked with the assistant to the initial reporting physician, Dr. Ison, who stated that "the patient was never on allopurinol and was receiving Uloric samples (40mg daily)." Ms. Seng emailed this information to Dr. Paris. Betsy Fletcher then approved the final language of the MedWatch form with the reference to the patient's having an allopurinol/Imuran adverse drug interaction removed.

7

17.     The eventual MedWatch form generated by Takeda for this event (TPA2009A02409) reported the event as "serious," but the adverse event was changed from the unlabelled event "Bone marrow failure" to labeled "Drug interaction" with secondary factors of "Anaemia macrocytic" and "Leukopenia."   The MedWatch form's "Intitial Reporter" was changed from Dr. Rodney K. Ison to Dr. Mitchell Haut.   The reporting doctors' causality assessments were changed from "definite" to "possible."   No 15 day report for a serious, unlabeled event was sent to the FDA.

18.     Bone marrow suppression is a well known side effect of overdosing drugs affecting the immune system, such as Imuran (azathioprine).   This patient had been safely taking Imuran (azathioprine) to reduce an auto-immune response aggravating his skin blisters condition (bulbous pemphigoid).   Drs. Ison and Haut's reporting the bone marrow suppression as definitely caused by Uloric was consistent with Uloric's interfering with Imuran's metabolism, elevating the normally safe doses of Imuran to a toxic, immune suppressive level, resulting in bone marrow suppression.

19.     Dr. Paris and Betsy Fletcher's efforts to alter the reporting of this very serious adverse event were improper and illegal for a number of reasons.   First, "bone marrow suppression" is considered a "serious adverse event," whether or not it results in hospitalization. Per "List of MedDRA Preferred-Terms to be Considered 'Serious by Primary System-Organ-Class Based on WHO-ART Critical Terms," in the middle column under "MedDRA: pt name," there are several entries for "bone marrow depression."   ("Bone marrow depression" is the same as "bone marrow suppression.")

20.     So, Dr. Paris' attempt to avoid a 15 day report by saying the patient was not hospitalized was not only factually incorrect since the patient was eventually determined to have

8

been hospitalized, but hospitalized or not, bone marrow suppression/depression is considered "serious." In fact, it is one of the most serious direct adverse drug effects. Incredibly, the term "Bone marrow suppression" does not appear at all in the final MedWatch form for TPA2009A02409 filled out per Dr. Paris and Betsy Fletcher's instructions despite both reporting physicians having advised Takeda representatives that the patient had suffered the verbatim adverse reporting term "Bone marrow suppression." Changing the verbatim reporting terms for an adverse event is a serious violation and fraud in adverse drug reaction reporting practice per ICH and FDA guidelines. It is the equivalent of altering clinical trial data. Both Michelle Seng and Rosi Odolio had complained to Dr. Ge that they had been asked by their supervisor to change verbatim adverse event reporting terms on many occasions.

21. Second, switching from the unlabeled condition of "bone marrow suppression" to labeled "Drug/Drug Interaction" in order to avoid the 15 day expedited report was both incorrect and misleading. While Uloric's presently published label contraindicates use of Uloric with Imuran (azathioprine), that warning is based upon studies of other drugs' interaction with Imuran, not Uloric. Section 7 Drug Interactions of the Uloric package insert states: "Uloric is an XO inhibitor. Drug interaction studies of Uloric with drugs that are metabolized by XO (e.g....azathioprine) have not been conducted. FDA guidelines dictate that for an adverse event to be considered "labeled," hence "expected," the manufacturer must have documented a determined rate of that adverse event in clinical trials the company sponsored for that drug. Since Takeda did not perform any clinical trials with Uloric used in conjunction with Imuran, a Drug/Drug Interaction adverse event is not considered "labeled" or "expected." Thus, switching the adverse reaction description to Drug/Drug interaction still did not relieve Takeda of the responsibility of providing an expedited 15 day warning to the FDA. Maria Paris's machinations

to avoid the 15 day report by changing the reported event to "Drug/Drug Interaction," itself a violation, did not actually obviate the 15 day requirement.

22.     And third, the FDA actually recognized this problem during Uloric's pre-approval process and sent letters to TAP directing them to conduct drug interaction studies regarding Imuran and a cytotoxic chemotherapy like Methotrexate (MTX). One such letter sent by FDA's Director of Drug Evaluation, Dr. Robert Meyer, to TAP's Assistant Director of regulatory affairs, Binita Kwankin, dated October 14, 2005 stated:

> 2. Evaluate the potential for pharmacokinetic interactions with Uloric when coadministered with theophylline, azathioprine or mercaptopurine. Uloric should be studied at its maximum proposed clinical dose, and theophylline, azathioprine and mercaptopurine may be studied at sub-therapeutic doses in order to decrease the incidence of adverse effects, if indeed Uloric does increase the exposure to these compounds in which xanthine oxidase plays a role in their metabolism. The results of these studies will provide information on dose selection when these drugs are co-administered. Without these studies, co-administration of Uloric with theophylline, mecaptopurine or azathioprine will need to be contraindicated and risk minimization strategies may be needed to assure that no such concomitant use will occur in the actual use setting.

23.     Although Takeda did undertake a post-marketing DD/I study for theophylline (discussed in more detail below), Takeda failed to conduct DD/I studies for azathioprine (Imuran) as directed above by the FDA. This failure to conduct drug interaction studies helps explain Takeda's Vice President of Pharmacovigilance Maria Paris' extraordinary efforts to avoid sending to the FDA required reports of Drug/Drug Interactions with these drugs as unlabeled, serious 15 day reports or why she had people pressure reporting physicians to retract or make equivocal statements regarding these DD/I's being causally related to taking Uloric. According to ICH guidelines, "For purposes of reporting adverse event reports associated with marketed drugs (spontaneous reports) usually imply causality." It is particularly deceptive of Takeda to not perform the recommended DD/I studies directed by Dr. Meyer in his 10/14/05

10

Approvable Letter, then, to turn around and assert that the Uloric label's reference to DD/I studies of drugs other than Uloric constituted "labeling." Even worse was forcing employees like Dr. Ge and Michele Seng to change the seriousness and relatedness assessments for Uloric DD/I events as if the DD/I studies had actually been done.

24.     Lastly, in January 2011, the FDA approved revisions to the Uloric label, including language to address the DD/I study results with theophylline. Despite Takeda's knowledge of the serious, unlabeled DD/I with Imuran (azathioprine) leading to bone marrow failure, and given the opportunity to revise and update the Uloric package insert pursuant to the Changes Being Effected regulation, 21 CFR 201.57, coupled with Dr. Meyers' specific request that an Imuran (azathioprine) DD/I study be performed to address serious Uloric DD/I's just like this, Takeda failed to mention any Uloric/Imuran DD/I bone marrow failure in its new labeling.

25.     Combined with the improperly reported fatal events discussed below, Uloric would have been subject to withdrawal had the serious and fatal adverse unlabeled Uloric events been properly reported. (For example, in Circulation 1998, "Withdrawal of Posicor From Market," wherein Posicor was withdrawn from the market due to dangerous and fatal DD/I.) Subsequent sales were arguably fraudulently obtained. Moreover, changing causality, seriousness and labeled/unlabeled assessments demonstrate willful NDA noncompliance, subjecting Takeda to having all of its sales proceeds for Uloric reimbursed back to federal and state governmental entities that paid for Uloric, along with the civil and criminal penalties imposed for such conduct.

B.     Prevacid Bone Marrow Failure

26.     Another egregious instance of deeming bone marrow suppression to be non-serious occurred on August 26, 2001 when a patient was reported by his pharmacist to be

suffering from bone marrow suppression and anemia while taking Takeda's Prevacid. According to MedWatch Form TAP2001Q01245, for the following *8 years*, Takeda essentially buried this adverse reaction. Although bone marrow suppression is recognized as serious, the serious adverse event boxes were not checked on this MedWatch form. Dr. Ge does not believe this MedWatch form was ever actually sent to the FDA. To make matters worse, this failure to report occurred during the time period when the Justice Department investigation and settlement regarding Lupron was occurring. So, this failure to properly report one of the most serious of adverse drug events calls into question the integrity of Takeda's reporting serious adverse events for all of its drugs.

27.     As a precursor "proton pump inhibitor" sharing the same molecular composition as Kapidex/Dexilant, Prevacid and Kapidex/Dexilant operate in a similar manner to influence the absorption of other drugs, thereby leading to excess doses of those other drugs taken at normal doses. This patient's bone marrow failure likely developed taking a normal dose of one drug that was elevated to toxic levels due to Prevacid's increasing its rate of absorption/metabolism.

28.     Dr. Ge became aware of this unreported bone marrow failure event in late August 2009 when Takeda's ARISg database was in the process of being merged with TAP's. During a weekly pharmacovigilance meeting, one of Takeda's specialists advised the group that he had found this unreported bone marrow failure case involving Prevacid use in 2001. Janet Johnston told the group that Maria Paris, Takeda's Vice President of pharmacovigilance, determined the event was non-serious and it did not need to be processed for reporting—even though bone marrow failure is a serious, unlabeled event subject to expedited 15 day reporting to the FDA. Already hypersensitized to Maria Paris' manipulating reporting the Uloric bone marrow failure that same month, after the meeting, Relator Dr. Ge opened the ARISg database and conducted a

search for the Prevacid bone marrow failure and a MedWatch form dated August 26, 2009 for an event that was reported by a Yale University pharmacist, Dave Brzozwski in 2001 (the number following "TAP" on the form, TAP**2001**Q01245, indicates the year 2001).

29.    What makes this failure to report especially improper was that in 1997, the FDA had sent TAP a Prevacid post-marketing report from the Division of Gastrointestinal and Coagulation Drug Products alerting TAP to 13 Prevacid serious, unlabeled hematologic adverse events. Amongst those events were multiple reports of thrombocytopenia, leukopenia and hemolytic anemia—all events consistent with bone marrow failure. The FDA asked TAP to evaluate the data and suggest labeling changes.

30.    TAP explained away the events as overly conservative diagnoses by foreign-sources like Japan, incorporating a footnote to the Adverse Reactions modification regarding these events stating: "The majority of hematologic cases received were foreign-sourced and their relationship to lansoprazole [Prevacid] was unclear." Although the FDA accepted this equivocating language, it recommended that "further vigilance is appropriate." Thus, both TAP and the FDA were sensitized and on the alert for additional hematological adverse events, so it probably was not an accident that this 2001, Yale University-sourced (i.e. certainly not foreign) bone marrow failure event found its way into the non-serious, unreported pile. During discovery, the ARISg database should be interrogated for additional hematological evidence of bone marrow failure events that went unreported or improperly reported as "non-serious."

C.    Methadone Overdose Death from Drug/Drug Interaction with Uloric

31.    Another incorrect reporting to the FDA involved a Drug/Drug Interaction between Uloric and Methadone resulting in the patient's death. This is one of 5 post-marketing deaths of patients taking Uloric within Uloric's first 6 months on the market. Other companies have

13

addressed an even lesser death frequency by withdrawing the drugs. Betsy Fletcher, Uloric's Project Manager, repeatedly told Relator Dr. Ge and other members of Takeda's pharmaco-vigilance department that the FDA would take aggressive action if there were 6 or more fatal adverse events reported while patients were taking Uloric. Adding a fatality warning to the Uloric label so soon after its initial marketing would have severely hampered Uloric sales, particularly since there was an established competitor drug already off-patent and being sold more cheaply as a generic, allopurinol. So, Takeda executives were incentivized to avoid reporting Uloric related fatal adverse events.

32.     Uloric had already been determined to have failed to out-perform allopurinol, so the addition of a fatal side effect warning could have itself been fatal to Uloric's staying on the market. A committee of the British National Institute for Health and Clinical Excellence concluded that although febuxostat (Uloric) had been shown to be more effective than fixed-dose (300 mg) allopurinol in lowering serum uric acid concentration, it had not been shown to be clinically more efficacious or cost effective compared with allopurinol when taken to control uric acid levels (up to 900 mg). However, the committee recommended febuxostat (Uloric) for people who are intolerant of allopurinol.

33.     Takeda case TPA2009A00807 was a patient that had been on methadone maintenance therapy, but died 37 days after being administered Uloric at 80 mg/daily for gout treatment, less than two months after Uloric had entered the market. The treating physician reported possible drug overdose (methadone), but did not provide the information on the nature of this drug overdose (accidental or intentional). This case was initially reviewed by Dr. Uwa Kalu (Takeda employee) in May 2009. Per his opinion entered on the MedWatch form sent to the FDA, at Company Remarks, the death was not related to Uloric.

14

34.     When Takeda received this patient's autopsy report in late August or early
September, 2009, the case was re-opened for update. Takeda specialist, Linda Roberts, RN
brought this autopsy report to Dr. Ge's attention for medical review, because Dr. Uwa Kalu had
left the company in June.  While reviewing the autopsy report, Dr. Ge noticed that (1) the
patient's methadone serum level was over 7,000 ng/ml (the lethal dose was between 60-4,500
ng/ml depending on each individual's threshold of tolerance); and (2) that the patient's
methadone daily maintenance dose was 140mg/daily.  Using methadone maintenance treatment
for illicit drug treatment is a highly controlled government program and the patient's serum
methadone level has to be closely monitored by the treating physician at the clinic.   Since
methadone is a highly controlled substance, normally, the patient does not have access to obtain
a large enough quantity of methadone to cause a fatal outcome.  Dr. Ge knew that methadone has
a Drug/Drug Interaction with many prescription drugs because it is metabolized through CYP450
isoforms.  Dr. Ge reviewed the Uloric package insert and observed that Uloric shares the same
metabolizing enzyme, CYP1A2, with methadone, and thus Uloric could be an inhibitor slowing
down methadone metabolism, so it stayed in the system un-metabolized longer and,
consequently, could raise the methadone serum concentration to a fatal level.  Additionally, she
reasoned that people abusing illicit drugs normally do not choose methadone for recreational
purposes because methadone has a very long half life (24 hours).  Thus, Dr. Ge did not believe
the company's previous assessment of intentional/accidental overdose was accurate, because if
the patient had intended to commit suicide or recreationally exceeded the safe dose, he could
have done this at any time during the methadone treatment course, and he had not.  An apparent
overdose occurred while he was taking Uloric.  So, Dr. Ge wrote to Linda Roberts and asked her
to add a second adverse event of possible Drug-Drug Interaction to this case based on the

15

information revealed from the autopsy report, and Linda Roberts refused.  She told Dr. Ge that this had to be approved by her manager, Betsy Fletcher.  The MedWatch form was not ever revised to incorporate Dr. Ge's analysis.

        D.      Uloric Fatal Drug/Drug Interaction with Immune Suppressant Methotrexate

        35.      Takeda case # TPA2009A02438 is related to the death from a Drug/Drug Interaction between Uloric and Methotrexate (MTX), another immune suppressant like Imuran, discussed above, used to treat auto-immune diseases, in this case, rheumatoid arthritis.  The reporter, Dr. James Cohen, had already conducted testing and concluded that this death was due to the interaction between Uloric and MTX because the patient's serum MTX level was very high, and the other two reported issues, stomatitis and dehydration, supported bone marrow toxicity caused from increased MTX serum level, again likely due to Uloric's interfering with MTX's metabolism, leaving un-metabolized MTX in the system longer than expected, and long enough for built up-normal dosage to accumulate until a toxic serum level resulted.

        36.      Notwithstanding, the statement in the narrative indicated that Uloric use was not causally related to the death.  Dr. Ge believes the statement attributed to Dr. Cohen in the narrative report that Uloric was "not related" was not his actual conclusion, but was instead the result of coercive, misleading phone calls made to him by Takeda personnel.  Dr. Ge argued with Maria Paris and Elizabeth Fletcher (the Product Manager for Uloric) that this was indeed related and that Dr. Cohen had already conducted the tests showing it and based on those test results, Dr. Cohen had already concluded that the death was related to Uloric.  Dr. Ge attempted to persuade Paris and Fletcher that this incident was serious, unlabelled and related, but they rejected Dr. Ge's arguments.

37.    Uloric's drug-drug interaction with Imuran and MTX has particular significance due to all three drugs being widely prescribed to the geriatric population that has rheumatoid arthritis co-existing with gout. Takeda knew that Uloric was targeted to this special patient population and most of these patients were either on Imuran or MTX. Relator Dr. Ge believes that Takeda intentionally ignored FDA's Dr Meyers' suggestion during the New Drug Application phase that Drug-Drug Interaction studies be performed with these types of drugs; if Takeda had performed such studies, they would have been required to put adverse DD/I study results into the label, thereby discouraging switching from established competitor drugs like allopurinol, hampering Uloric's ability to gain a market foothold once approved for sale in March 2009.

38.    Instead of performing the requested DD/I studies, Takeda opted for a package insert that stated: "7.2 Cytotoxic Chemotherapy Drugs. Drug interaction studies of ULORIC with cytotoxic chemotherapy have not been conducted. No data are available regarding the safety of ULORIC during cytotoxic chemotherapy." This Uloric package insert statement was extremely misleading and dangerous, especially after this August 25, 2009 DD/I death with MTX, a well recognized cytotoxic chemotherapy.

E.    Misreporting and Mislabeling of Uloric DD/I events with Theophylline

39.    During the summer and fall of 2009, Takeda received several (more than 3) serious adverse events reports attributing DD/I between Uloric and theophylline. Hospitalizations were required to treat theophylline plasma levels 400 times greater than accepted levels under normal dosage. These were serious, unlabelled events that should have been the subject of expedited 15 day reports to the FDA. Instead, Dr. Paris wrongly asserted that theophylline DD/I was labeled, so no 15 day report was prepared.

17

40.     Again, in order to have been considered "labeled," this adverse reaction would have to have been found as a result of a Takeda Uloric clinical trial addressing Drug/Drug Interaction between Uloric and theophylline.   Since by the end of 2009, no such Uloric/ theophylline DD/I trials had been conducted by Takeda, any Theophylline interactions with Uloric were in fact <u>unlabelled</u> therefore unexpected, and if serious, subject to a 15 day expedited report to the FDA.

The 2009 and 2010 Uloric package inserts stated:

Drug interaction studies of ULORIC with other drugs that are metabolized by XO (e.g., theopylline, mercaptopurine and azathioprine) have not been conducted. Inhibition of XO by ULORIC may cause increased plasma concentrations of these drugs leading to toxicity.  [*See Clinical Pharmacology (*12.3*).*]   ULORIC is contraindicated in patients being treated with azathioprine, mercaptopurine or theopylline [*see Contraindications (4)*].   (See section 7.1 of the 2010 Uloric package insert.)

41.     As this section of the package insert states, no drug interaction studies with theophylline had been performed at that time.  So, Dr. Maria Paris violated the 15 day reporting guidelines by asserting this group of serious, hospitalized theophylline DD/I events were labeled and expected when they were not.

42.     Moreover, this failure to report did not occur in a vacuum—during the NDA work-up and prior to Uloric's approval for marketing, the FDA had indeed recommended that Takeda perform drug interaction clinical trials regarding Uloric and theophylline.  Dr. Meyer's approvable letters stated:

2. Evaluate the potential for pharmacokinetic interactions with Uloric when coadministered with theophylline, azathioprine or mercaptopurine.  Uloric should be studied at its maximum proposed clinical dose, and theophylline, azathioprine and mercaptopurine may be studied at sub-therapeutic doses in order to decrease the incidence of adverse effects, if indeed Uloric does increase the exposure to these compounds in which xanthine oxidase plays a role in their metabolism.  The results of these studies will provide information on dose selection when these drugs are co-administered.  Without these studies, co-administration of Uloric

with theophylline, mecaptopurine or azathioprine will need to be contraindicated and risk minimization strategies may be needed to assure that no such concomitant use will occur in the actual use setting.

Takeda opted to have the drug marketed with the contraindication instead of conducting the DD/I

trial prior to approval.

43.     Per a January 21, 2011 Supplemental Approval letter, Takeda did perform a post-

marketing DD/I trial with theophylline. That study found a DD/I between Uloric and theophyl-

line, and the FDA accepted Takeda's recommended label revision as follows:

Drug-Drug Interactions
*Effect of ULORIC on Other Drugs*
*Xanthine   Oxidase   Substrate   Drugs-Azathioprine,   Mercaptopurine,   and*
*Theophylline:* Febuxostat is an XO inhibitor. A drug-drug interaction study evaluating the effect of ULORIC upon the pharmacokinetics of theophylline (an XO substrate) in healthy subjects showed that coadministration of febuxostat with theophylline resulted in an approximately 400-fold increase in the amount of 1-methylxanthine, one of the major metabolites of theophylline, excreted in the urine. Since the long-term safety of exposure to 1-methylxanthine in humans is unknown, use with caution when co-administering febuxostat with theophylline.

44.     The reference to the 400-fold increase of a theophylline metabolite in the urine

was somewhat misleading and mollifying. Excretion of a metabolite in the urine suggests a lack

of toxicity and the body's ability to deal with the elevated theophylline levels. A more accurate

and informative warning would have stated what levels the plasmaconcentration of theophylline

reached as a result of co-administration with Uloric, data that was likely collected by Takeda in

the clinical trial. The language actually used would confuse clinicians about the actual toxicity

of this DD/I.

45.     What Dr. Meyer recommended in his 2005 Approvable Letters was a pharmaco-

kinetic interaction study. Pharmacokinetic interaction studies determine whether one drug could

alter the other drug's plasma concentration in a way that could increase toxicity.

Pharmacokinetic interaction studies focus upon a drug's plasma concentration in a human body.

On the other hand, "drug metabolism" focuses upon the drug's disposition from one place to another place in the human body—there is no issue of toxicity involved.  The description in the 1/28/11 revised Uloric package insert describes theophylline's disposition detected in the urine, which fails to convey the toxic plasma levels theophylline reaches in a DD/I with Uloric, hence it is misleading.

46.     Takeda did not answer whether the theophylline drug interaction study showed any changes of theophylline plasma concentration when co-administered with Uloric.  Had they done so, they would have had to identify theophylline's major toxicity is arrhythmia when its plasma concentration gets elevated too high.  Thus, Dr. Ge believes Takeda failed to answer the issue requested by Dr. Meyer.

47.     Also, given the opportunity to make Changes Being Effected modifications to the Uloric package insert, Takeda failed to mention the multiple serious, hospitalized adverse event reports attributed to DD/I between Uloric and theophylline Dr. Ge witnessed in 2009.  Likewise, given that they were updating the label, they should have reported the 3 deaths discussed herein that were also reported in summer 2009 due to Uloric.

F.      Takeda Pharmacovigilance Specialists Harassed Physicians Reporting Adverse Events in Order to Change or Obtain Equivocating Causal Relation Language

48.     Takeda Cases #TPA2009A01116 and TPA2009A01545 involve two deaths initially reviewed by Dr. Uwa Kula, Takeda's Global Safety Leader for Uloric.  In his company's comment, he denied a causal association of these deaths with Uloric.  According to Dr. Ge, it had been a common practice at Takeda, not seen with other companies she had worked for, that when Takeda received a serious adverse event report or death, Takeda specialists were required to call the adverse event reporters and coerce the reporters to answer "yes" or "no" on whether the event or death was caused by Takeda's drug.  If the reporters could not answer "yes" or "no," the

specialists would write "the reporter commented the event/death was not related to company's drug..." in the case narrative, and reported the adverse events to the FDA as "Not Related" to Takeda's products.

49.     According to Dr. Ge, this type of coercive behavior is contrary to the principal of spontaneous reporting, and it is against ICH guidelines. A fundamental principal of spontaneous reporting in the FDA's guidelines has been that as long as there is a **suspicion** that a particular drug caused an adverse event or resulted in death, anyone could pick up a phone and report it to the manufacturer; and the manufacturer would be **required to** assume responsibility for the causality--this has been a fundamental principal of spontaneous reporting. Dr. Ge saw Takeda specialists spend hours on phones calling reporting physicians and asking them for a definitive causality answer, then they would come to her office and tell her "the reporting physician said that the event was not related to our drug...." Dr. Ge often asked the specialists, "Why did they report such an event to Takeda if they thought it was unrelated?" In the event that the adverse event reporter did not return the specialists' calls, their Takeda supervisor, Janet Johnston, would ask them to keep calling the reporter (with the excuse of following up) until they got some sort of favorable answer, so they would put the "favorable" answer into the case narrative. These two MedWatch forms display the equivocating language the specialists were instructed to use when they could not reach the adverse event reporter, suggesting a causal association could not determined.

50.     Similarly, relative to Takeda Case # TPA2009A02459, Dr. Ge believes the statement that "the rheumatologist assessed the event as not related to Uloric therapy..." is the untrue result of coercive calling by Takeda specialists enabling them to include this denial of causal association.

G.   Elevated SJS (Steven-Johnson Syndrome) and TEN (Toxic Epidermal Necrosis) Events for Uloric Patients

51.   Another area of improper or false reporting of Uloric adverse events relates to serious skin eruption.  One of Uloric's major superiority claims in Takeda's NDA was that Uloric had fewer incidents of SJS (Steven-Johnson Syndrome) and TEN (Toxic Epidermal Necrosis).  To the contrary, Dr. Ge saw that, between March and April, 2009, the first 2 months that Uloric was marketed, Takeda received at least 2 or 3 spontaneous reports of SJS and TEN.  In late 2009, there were 4-5 SJS being reported.  This showed the reporting rate on these two serious skin eruptions were much higher than the background population, and is not better than allopurinol.  The background rate of SJS and TEN was 1/1,000,000.00/patient year.

H.   Kapidex/Dexilant DD/I with Digoxin Increasing Plasma Levels 500 Times Greater than Normal

52.   Relative to Kapidex/Dexilant, in May 2009, Takeda received a report of a patient's injury due to a life threatening toxic level of digoxin in his system.  He had been taking digoxin for cardiovascular problems, and then began taking Kapidex.   This is another circumstance of a patient population likely to have GERD and cardiovascular problems, therefore likely to take both Kapidex and digoxin, and thereby undergo a Drug/Drug Interaction between the two drugs.  Unfortunately, Kapidex's metabolism can result in the normal dosage of digoxin getting elevated to toxic levels, which is what occurred with this patient.

53.   Dr. Ge recalls that this event involved an elevated digoxin level 500 times greater than normal.  When this remarkable event was discussed at Takeda's pharmacovigilance weekly meeting in May 2009, Dr. Ge viewed it as a serious (life threatening) and unlabeled event, requiring an expedited 15-day report to the FDA.  Dr. Ge recalls that when a specialist brought up this case to the meeting, everyone was shocked by the enormous plasma level of digoxin.

22

Nevertheless, Takeda's Global Safety Leader (GSL) for Dexilant/Kapidex, Dr. Aruna Dabholkar (a former TAP employee that transferred to Takeda with essentially the same problems regarding her pharmacovigilance education and experience as the section's vice-president, Dr. Maria Paris) said: "The interaction with Digoxin was labeled, and no 15-day needed." Everyone became quiet. Dr. Ge believes that this particular event was not reported as an expedited 15-day report to the FDA. Dr. Chris Chapman and Dr. Ge asked Nurses Johnston and Fletcher why the company had not conducted a Drug/Drug Interaction study with digoxin during the NDA Phase I in late 2009 when similar events had been reported regarding Kapidex/Dexilant Drug/Drug Interaction, and Fletcher responded to Drs. Chapman and Ge, "It would cost the company too much money to do that."

54.     Dr. Ge's review of the current published United States Package Insert (USPI) for Kapidex/Dexilant disclosed no reference to interaction with digoxin under section 6.2/Post Marketing Experience, which was not true. However, under section 7/Drug Interactions, it misleadingly states: *"It is theoretically possible that Dexilant may interfere with the absorption of other drugs where gastric PH is an important determinant of oral bioavailability (e.g.ampicillin esters, digoxin, iron salts, ketoconazole)."*

55.     This was deceptive in that Takeda had already received more than one serious drug interaction report between digoxin and Kapidex/Dexilant following Takeda's having received approval more than a year and half earlier. Moreover, the Insert language suggested that Dexilant/Kapidex *lowered* digoxin plasma level by interfering with its absorption, the opposite of accelerating and increasing its passage into blood plasma. The mechanism causing this reaction was well recognized to the point that in its 2006 Guidance, the FDA identified the study design and studies to be performed as part of new drug development (NDA) to assess what

needed to be included in labels to address potential Drug/Drug Interactions with digoxin. Instead of performing those studies for Kapidex/Dexilant, Takeda included the foregoing deceptive language in Kapidex/Dexilant package insert, then used that reference, unsupported by any of the suggested clinical safety trials, to claim such Drug/Drug Interactions with digoxin were "labeled." Again, in order to have been considered "labeled," this adverse reaction would have to have been found as a result of a Takeda Kapidex/Dexilant clinical trial designated by the FDA for drugs that may have an adverse interaction with digoxin. Since no such trials were conducted by Takeda, any digoxin interactions with Kapidex/Dexilant were in fact unlabelled therefore unexpected, and if serious, subject to a 15 day expedited report to the FDA.

56.     It should also be noted that during this time frame, there was an epidemic of digoxin toxicity claims being reported in the press and to the FDA, resulting in multiple lawsuits related to a possible double dose of digoxin in some caplets/capsules of digoxin. Unbeknownst to those claimants, many likely had a Drug/Drug Interaction with a Proton Pump Inhibitor (PPI) (anti-GERD) medication like Kapidex/Dexilant. Most of those lawsuits failed when the patients could not establish a double dose caplet/capsule of digoxin, not understanding that they may have actually had a Drug/Drug Interaction with a PPI, instead.

57.     Takeda's motivation to fraudulently report and under report the serious adverse events was driven by an economic desire to falsely enhance Uloric's, Kapidex/Dexilant's and Prevacid's safety profiles, to avoid excess 15 day and reports of drug-connected deaths requiring a label change that would negatively affect the marketing of their new drugs, to avoid patients' discontinuing use due to fear of adverse events thereby maintaining continued consumption and existing sales and also to expand sales into patient populations and physicians ignorant of the Drug/Drug Interactions the patients might suffer with other medications they were also taking.

Takeda's Vice President of the Pharmacovigilance Department, Dr. Maria Paris, informed her employees, including Relator Dr. Ge, "As a company, reporting adverse events is one thing, but we must make sure that the company has to be profitable first."

58.     As outlined above, on multiple occasions Takeda improperly instructed its medical reviewers, including Relator, Dr. Helen Ge, to change their professional opinion concerning adverse event classifications and assessments.   When Relator complained of the improper reporting, her contract was summarily terminated.

59.     But for Takeda's fraud, Government health care programs would have paid for substantially fewer Uloric, Kapidex/Dexilant and Prevacid claims.   But for Takeda's misreporting of adverse events, persons responsible for authorizing Uloric,  Kapidex/Dexilant and Prevacid to be placed on formularies would be disinclined to approve at all or only with substantial curtailments of their use to prevent toxic Drug/Drug Interactions.  But for the fraud, physicians would have prescribed Uloric, Kapidex/Dexilant or Prevacid less frequently than they did, and patients would have used Uloric, Kapidex/Dexilant or Prevacid less than they did.  Upon information and belief, Takeda's fraud has caused tens of thousands of false claims to be made on federal and state health care programs causing the Government to have suffered hundreds of millions of dollars of damages.

## II.     FEDERAL JURISDICTION AND VENUE

60.     The acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein occurred in the District of Massachusetts and elsewhere, as Defendants do business in the District of Massachusetts and throughout the United States.   Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. §§ 1331 and 1345.  This Court has supplemental jurisdiction over this case for the claims brought on

behalf of the states (referenced in paragraph 2) pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of said states which arises from the same transactions and occurrences as the claims brought on behalf of the United States.

61.    This court has personal jurisdiction over defendants Takeda Pharmaceutical Company Limited and Takeda Pharmaceuticals North America, Inc. pursuant 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because defendants have minimum contacts with the United States.  Moreover, the defendants can be found in, reside, or transact or have transacted business in this District.

62.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §1391 because Defendants transact business in this District, and one or more of the acts proscribed by section 31 U.S.C. §3729 occurred in this District.  At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees and offices in this District, and made significant sales within this District.

63.    The facts and circumstances alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

64.    Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act.

**III.    PARTIES**

65.    The United States funds the provision of medical care, including pharmaceutical products, for eligible citizens through Government Healthcare Programs such as Medicare, Medicaid, TRICARE and other agencies and programs, acting through the Centers for Medicare

& Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

66.     Relator Helen Ge, M.D. is a resident of North Reading, Massachusetts. Dr. Ge is a graduate of the First Medical University of Shanghai and conducted her residency and post-doctorate education at the Postgraduate Medical School of PLA in Beijing, China. During the 1980s and 1990s, she was a Clinical Research Fellow at the University of Pittsburgh School of Medicine and later became an Associate Medical Director at Harvard Clinical Research Institute, which is affiliated with Harvard Medical School.

67.     From 1998 through to the present, Dr. Ge has worked as an independent consultant and contractor for various major pharmaceutical companies in the United States. Her work has specialized in assisting pharmaceutical companies with, among other things, preparing FDA mandated safety reports, reviewing and evaluating clinical trial data, performing medical review for spontaneous and clinical study adverse event reports and making side-effect causality assessments associated with a manufacturer's pharmaceutical products.

68.     In September 2008, Dr. Ge accepted an assignment to consult as a Contract Physician of Drug Safety with Takeda Pharmaceuticals North America. The consulting agreement had an initial term of one year with an end date of October 6, 2009.

69.     Dr. Ge was contracted to, among other things, perform medical review of spontaneous and clinical trial adverse events and serious adverse event reports; to confirm the seriousness of the adverse events; to make causality assessments; and, to assist with risk management by identifying and evaluating potential safety signals and providing analysis of product safety. As part of her assignments, she was assigned to medically review all adverse events associated with the drug Uloric.

70.     Because of her excellent performance at Takeda, Dr. Ge's initial consulting contract was extended another six months, with a new end date of March 31, 2010.  She was continuously a contractor for Takeda Pharmaceuticals North America at its Lake Forest, Illinois facility from October 2008 until her contract was prematurely and wrongfully terminated on January 15, 2010.

71.     Takeda Pharmaceutical Company Limited ("TPC") is a Japanese corporation having its corporate headquarters and principle place of business in Osaka, Japan.  TPC is the largest pharmaceutical company in Japan.  According to its 2009 annual reports, TPC's annual sales exceeded $15 billion.

72.     Takeda Pharmaceuticals North America, Inc. ("TPNA") is a wholly owned U.S. subsidiary of TPC.  TPNA is organized under the laws of Delaware and has its principal place of business in Deerfield, Illinois.  TPNA is one of the 15 largest pharmaceutical companies in the United States.  According to its annual report, TPNA's 2008 annual sales were reported to be in excess of $5 billion.  Much of Takeda's recent and current pharmaceutical sales are derived from Uloric, Kapidex/Dexilant and Prevacid prescriptions.

73.     In 2008, TPNA merged with TAP Pharmaceutical Products, Inc. ("TAP"), which was another TPC subsidiary.  TAP had a history of dealing dishonestly with the federal government.  In 2001, TAP, as well as six of its corporate executives, pled guilty to various charges arising out of their "fraudulent drug pricing and marketing conduct" with regard to Lupron, a Takeda drug used to treat prostate cancer.  To avoid prosecution, TAP pled guilty to conspiracy to violate the Prescription Drug Marketing Act and paid a $290,000,000 criminal fine (which at the time was the largest criminal fine ever in a health care fraud prosecution).  In addition, as part of the plea agreement, TAP agreed to settle its federal civil False Claims Act

liabilities and to pay the U.S. Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct. TAP also agreed to comply with the terms of a sweeping Corporate Integrity Agreement, which, among other things, required it to deal honestly with the United States and the Medicare and Medicaid programs.

74.     Following the 2008 merger, many of TAP's employees, including some of the employees who had pled guilty to fraud, continued their employment at TPNA.

75.     TPC and TPNA will be collectively referred to as "Takeda" or "Defendants."

76.     Takeda is engaged in the business of research, developing, manufacturing and marketing of a broad spectrum of pharmaceutical products, including Uloric, Kapidex/Dexilant and Prevacid.

77.     Takeda is currently transacting business in the District of Massachusetts, at least by maintaining offices and employees in this District, making and shipping into this District, or by using, offering to sell, or selling or by causing others to use, offer to sell or sell, pharmaceutical products, including Uloric, Kapidex/Dexilant and Prevacid in this District. Takeda derives substantial revenue from interstate and or international commerce, including substantial revenue from goods used or consumed or services rendered in the State of Massachusetts and this Judicial District.

## IV.     THE FALSE CLAIMS ACT

78.     The False Claims Act (hereinafter referred to as "FCA" or "the Act"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by

frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of Government fraud to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the government and private Relators' burdens in investigating and prosecuting *qui tam* suits under the FCA.

79.     The FCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false record or statement material to a false or fraudulent claim is liable for a civil penalty ranging from $5,000 up to $10,000 (and adjusted upward for inflation) for each such claim, plus three times the amount of the damages sustained by the federal government.

80.     The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time). Based on these provisions, *qui tam* plaintiff/relator seeks through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

## V.      FEDERAL HEALTH CARE PROGRAMS

81.     In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §1395 to 1395ccc.  Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

82.     In 1965, the federal government also enacted the Medicaid program.  It is a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals.  The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS. 42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  42 U.S.C. §§1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan."  See 42 U.S.C. §1396b(a)(1).  This federal-to-state payment is known as Federal Financial Participation ("FFP").  Outpatient prescription drugs are covered under the Medicaid Program as long as they meet the definition of a "Covered Outpatient Drug."

83.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel.  10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199.  TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted for outpatient prescription drugs.

31

84.     Pharmaceutical drugs are also used on an inpatient basis, purchased by nursing homes, hospitals, and other facilities for inpatients.  Generally, in such settings, the provider does not separately bill the Government Healthcare Programs for the drug; rather, the provider is reimbursed based upon a composite rate, a daily rate, the actual cost, or a combination.  Even so, federally funded Government Healthcare Programs such as Medicare Part A, Medicaid inpatient, and TRICARE inpatient benefit are damaged when they pay for pharmaceuticals that have been paid for in violation of the FCA.

85.     Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."  This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."  Medicaid, TRICARE and other federally funded programs restrict coverage under the same principle.

86.     Hospitals and other inpatient facilities participating in the Medicare, Medicaid and other federally funded Government Healthcare programs are required to file annual cost reports with the appropriate agencies.  When a provider submits a Medicaid cost report which includes requests for payment for pharmaceuticals that were not reasonable and necessary, the claims for those expenses are legally false.

## VI.    THE FOOD, DRUG AND COSMETIC ACT AND ITS POST MARKETING SAFETY REPORTING REGULATIONS

87.     The Food and Drug Administration ("FDA") is the agency responsible for protecting the health and safety of the American public by ensuring, among other things, that pharmaceuticals designed for use in humans are safe and effective for their intended uses and are labeled accurately and in compliance with the law.  Toward this end, FDA, pursuant to its

statutory mandate, regulates and monitors the approval, manufacture, processing, packing, labeling, and shipment in interstate commerce of pharmaceuticals.

88.     To ensure that consumers are receiving safe and effective drugs, Congress, through various amendments, enacted the Food, Drug, and Cosmetic Act, which requires that a drug manufacturer secure approval of a New Drug Application from the FDA before it may commercially market the drug. 21 U.S.C. §355(a). To obtain such approval, the manufacturer must undertake to conduct, and submit the results of, investigations in animals and humans that demonstrate that the drug is safe and effective for its intended uses and other information pertinent to an evaluation of the safety and effectiveness of the drug. 21 U.S.C. §355; see also 21 C.F.R. §314.50 (detailing contents of NDA). According to the statutory scheme, the FDA evaluates the safety and effectiveness of the drug and approves the directions for use and cautionary information in the labeling for the drug on the basis of the information supplied to it by the manufacturer. The FDA does not conduct its own tests of the drug. It relies on the manufacturer to inform it of adverse reaction reports. Thus, the FDA's ability to evaluate a drug's safety and efficacy and to protect the public adequately depends on the manufacturer's reports of timely, accurate and complete data to FDA.

89.     After the drug has been approved for commercial marketing, the FDCA and applicable regulations require the manufacturer to establish and maintain such records and make such reports as will enable the FDA to continue to evaluate the safety and effectiveness of the drug and, when appropriate, withdraw the New Drug Application or change the labeling. 21 U.S.C. §355(k).

90.     To implement Congress' mandate, the FDA promulgated 21 C.F.R. §314.80 and 314.81, which require expedited and accurate reports of postmarketing adverse drug experiences